## MAGNOLIA PETROLEUM CO. v. BOARD OF COUNTY COM'RS OF McCLAIN COUNTY et al.

No. 24357.    Sept. 22, 1936.

Rehearing Denied Dec. 22, 1936.

W. H. Francis, B. B. Blakeney, Hubert Ambrister, and W. R. Wallace, for plaintiff in error.

Purman Wilson, County Atty., and Roy Glasco, for defendants in error.

BAYLESS, J. Magnolia Petroleum Company, a corporation, appeals to this court from a judgment of the district court of McClain county, Okla., rendered against it and in favor of the board of county commissioners, and incidentally the taxing authorities of said county. It will be referred to herein as plaintiff and the others who must be mentioned will be referred to by familiar contractions of their true designations.

March 6, 1930, plaintiff filed a return of certain property for taxation in McClain county, Okla., in the manner prescribed by law. Included therein was this item of property: "975,165 bbls. crude — 38.1 to 38.9 gr. under one year @ 1.10 — $1,072,680.00." In December 1930, or January, 1931, when plaintiff received its statement of taxes due for 1930, it discovered this item of property in its tax statement, and thereupon filed with the county commissioners an application in the form of an affidavit for a certificate of erroneous assessment under sections 12639, 12641-42, O. S. 1931. This relief was denied by the commissioners, and plaintiff appealed to the district court. Upon a trial the plaintiff was again denied any relief, and we now have the matter on the record made there.

We will discuss one of plaintiff's contentions at this point, before passing to a discussion of the merits. The matter was set and heard on January 9, 1932, and taken under advisement. Thereafter, the trial judge permitted the commissioners to file additional pleadings, held later hearings, and then rendered judgment. This is assigned as error and much argument is made in support thereof. We can find no abuse of discretion in such action of the trial judge. No party was taken by surprise or deprived of an opportunity to be heard on any issue.

The general position of plaintiff is that the inclusion of said item in its return was unintentional and it should be relieved therefrom; and the relief is provided by the sections of our statutes supra. The tax-

ing authorities controvert this and invoke estoppel against plaintiff.

The facts relative to these particular issues are substantially as follows: In plaintiff's return for 1929, the item above quoted was included and taxes paid thereon. When plaintiff was preparing its return for 1930, the stenographer making it under the supervision of plaintiff's tax agent was instructed to copy the 1929 return, but to omit this particular item. Said stenographer inadvertently failed to obey such direction and erroneously included such item in the 1930 returns. This was not observed by the heads of plaintiff's tax department, and the return was mailed. Three or four days later plaintiff's tax department wrote the county assessor as follows:

"On the 14th instant we mailed you our rendition for the year 1930 of our property in your county, which you have no doubt received by now.

"You will note that crude oil was not rendered, due to the fact that we have not yet received the final figures on same. We hope to procure them in the next few days, and just as soon as we do, we will advise you."

The county assessor received the letter in due course, looked up the return and saw the discrepancy between the letter and return, but proceeded to assess plaintiff's property according to the return. On January 1, 1930, the date for assessing property, there was not 975,165 bbls. of oil, as described, in the tanks on the farm at Purcell, but there were 700,228 bbls. of crude oil on said tank farm on said date.

We are of the opinion that plaintiff proved that the return was erroneously prepared, and mistakenly included this item, and that such an amount of crude oil was not there on said date; it made a sufficient showing to invoke the jurisdiction of the county commissioners under section 12642, O. S. 1931. We are completely satisfied that plaintiff did not intend to return 975,165 bbls. of oil for taxation and to thereby render itself liable for taxes thereon. In that respect it was an erroneous assessment.

The trial court found from the evidence that there was on January 1, 1930, 975,165 bbls. of oil in the tanks, as indicated by the return and in substantiation of the return. This finding is against the clear weight of the evidence. In this respect the judgment of the district court cannot be sustained.

The method adopted by the plaintiff to obtain relief is authorized by statute (sec.

12642, supra), but is a proceeding and not a civil action. It is remedial legislation in the sense spoken of in Kramer v. Gypsy Oil Co., 68 Okla. 212, 173 P. 802. It would not serve a useful purpose to merely hold the trial court's judgment erroneous and reverse it for further trial when we have before us all of the evidence. We believe it is our duty to examine the record and direct the judgment to be entered in this matter in the interest of adequate and speedy justice.

This brings us face to face with the contention most strenuously urged by the plaintiff, to wit: (1) That it had no crude oil in the tanks on said date; (2) that any crude oil there was in the possession of Magnolia Pipeline Company, a corporation, and (3) such crude oil as it had was in the course of transportation in interstate commerce and therefore not taxable.

The view we take of these contentions will enable us to discuss the first two together.

We do not understand any of these contentions to raise the point of double rendition or double taxation as against the petroleum and pipe-line companies. In other words, both of them did not return it. In so far as the record is concerned, the plaintiff alone returned it.

The evidence shows that the plaintiff is the parent corporation, that the pipe-line company is its subsidiary, and that plaintiff owns and controls the pipe-line company completely. They maintain joint offices, keep duplicate records in some instances, have joint officers and employees in many instances, and the same tax department serves both companies. The parent company had in 1928 and 1929 made the only return for crude oil in tanks on this farm, and by its letter of March 17, 1930, indicated an intention to return whatever oil was there in 1930. This is sufficient to establish a custom and intention of the parent company to return such crude oil there as belonged to either which they thought taxable.

Generally, the aim of our taxing laws is to procure the rendition for taxation and the collection of taxes at least once a year of all taxable property in Oklahoma. Also, it is generally the aim of these laws to have property returned and taxes thereon paid by the owner. However, we have had occasion to consider the rendition for taxation and payment of taxes on such property by a parent corporation where the property actually belonged to a subsidiary corporation. See Payne County v. Empire Pet. Co., 104 Okla. 42, 230 P. 710. In other words,

once it is shown that property has been returned and taxes paid for a certain year, the general aim of our tax laws for that year has been met, and we will not look to the same property again for that year. We feel that the interest of parent corporations in the property of its subsidiary corporation is sufficient to entitle it to return it for taxation as its own and to pay taxes thereon. Section 12642, supra, authorizes the issuance of a certificate of erroneous assessment when property has been assessed to one who does not own it and who has not claimed to own it. If the title to this crude oil can legally be said to be in either plaintiff or its subsidiary pipe-line corporation, and the assessment is otherwise sustainable, we will not construe our laws to authorize the issuance of a certificate of erroneous assessment because, following a custom, the parent corporation returned property belonging to its subsidiary. We will leave them to adjust this affair between themselves for the particular year, as they have done in the past, and to change their procedure in the future if they so desire.

This brings us to the question of whether title to the oil in these tanks can be said to have been in either of these corporations.

The facts relating to the presence of the oil in these tanks are substantially as follows: The pipe line received oil from plaintiff and three other companies at various points in Oklahoma, north of this tank farm; the pipe line receives from these companies what are known as "tenders" of oil, which may be described simply as offers on the part of the companies to deliver to the pipe line within a specified period of time a specified quantity of a specified grade of crude oil, and a corresponding agreement on the part of the pipe line to receive, transport, and deliver such oil; this oil is of four grades classified according to the field from which it is produced; the various grades are kept separate, but no attempt is made to keep the various grades of the various shippers separate; on the contrary, all oil of a certain grade is commingled and no identity of ownership is attempted; the pipe line supply obligates itself to deliver to the shipper a like quantity of a like grade of oil at a designated point; that oil usually traveled at a speed of less than ten miles per hour, and therefore quite a period of time must elapse between the time oil was received and started on its journey and the time it could be delivered, some in Oklahoma and some in Texas, several hundred miles distant, but the pipe line stood ready to deliver oil to these shippers at dis-

tant points from oil already in its possession; that there were 17 tanks at Purcell, having a combined storage capacity of more than one million barrels of crude oil; that this tank farm was south of the Canadian river, and the pipe lines crossing the river were likely to be broken in times of flood, and the lines north of this tank farm were subject to various hazards which might interrupt the flow of oil from the north into this tank farm and thence south; that because of this the pipe line usually maintained a supply of crude oil in these tanks in storage, and likewise at other points on the line south of Purcell, against emergencies which might arise by interruption north or south of the particular points; that this was a policy deliberately decided upon and acted upon as a result of past experiences; that the more oil was moved into and out of the tanks the greater the harm to it in the nature of depreciation in quality, and because of this when oil was once placed in a tank to become a part of the quantity kept for emergencies it was not disturbed until demands therefor made its use necessary; that such oil remained sometimes for months undisturbed, and during a period involved herein the pipe line handled over 21,000,000 bbls. of crude oil through the pumps at Purcell without ever disturbing the oil stored in the tanks for emergencies; that of the storage tanks containing crude oil on January 1, 1930, two held the same oil all year, seven, the same oil for eleven months, six, the same oil for ten months, and two, the same oil for four or five months. In other words, 15 of these tanks held the same oil for ten months of the year or longer.

The evidence and contentions of the plaintiff take two divergent positions with reference to the title to this oil. It was first shown that once the oil came into the possession of the pipe line it was thereafter incapable of identification as to source of ownership. Later, it was shown by records, and argument is made by plaintiff, that about 400,000 bbls. of this oil belonged to it, and the remainder to the three other companies. This result was arrived at by taking the differences between tenders made and withdrawals.

Neither party has cited us a decision of any court upon the question of whether oil delivered to the pipe line, under the circumstances herein outlined, constituted a sale or a bailment. The Supreme Court of the United States noticed such a question, but did not discuss it. See Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 66 L. Ed.

227. In that case it was determined that the oil was in the course of movement in interstate commerce, and the title to it was immaterial as to taxability.

The record shows that the plaintiff tendered to the pipe line several millions barrels of oil during this period, and the pipe line was obligated to redeliver this oil to plaintiff when and where specified. The tanks in which this oil was stored belonged to plaintiff; the plaintiff kept daily records of the amount thereof in each tank; the oil was insured against loss by fire in the name of both, "as their respective interests might appear," and, as heretofore commented upon, the plaintiff theretofore had made the tax returns on the oil in these tanks, and did so for this year. In the letter to the assessor plaintiff did not deny liability from taxation due to lack of ownership, but announced its intended omission to return the oil in storage as being due to lack of figures, which would be remedied as soon as figures were available. It was not until this trial that it denied ownership. Under these circumstances, we are satisfied with the trial court's finding of plaintiff's ownership. If plaintiff were being controverted over the title of this oil and should produce the same evidence to support its claim of title, we would not hesitate to say that it owned the oil.

It would not materially aid plaintiff's position to hold that the pipe line owned the oil. We have said it was immaterial to our scheme of taxation whether the parent or subsidiary company returns the oil for taxation. It would not constitute grounds for a certificate of erroneous assessment that one returned the property of another, where that had been the practice and both had not returned it for taxation in the particular year. The record shows these related corporations used the same offices, the same staffs and employees where their business operations coincided or intermingled, and each kept complete and identical, if not duplicate, records of this oil.

The plaintiff finally contends that this oil was in the course of transportation in interstate commerce, and therefore was not subject to taxation by the state of Oklahoma. See Eureka Pipe Line Co. v. Hallanan, supra; Carson Petroleum Co. v. Vial, 279 U. S. 99, 73 L. Ed. 626; and Eastern Gulf Oil Co. v. Kentucky State Tax Com. (D. C.) 17 Fed. (2d) 394. Opposed to this contention is the argument of the taxing authorities that, conceding for the argument that such oil had probably started

in movement in interstate commerce, the movement had been broken, that such oil as was in the tanks on January 1, 1930, had come to rest, and had a taxable situs in McClain county, Okla.

This is necessarily a matter of law under the Constitution and statutes of the United States. The various courts of the United States have had occasion to pass upon numerous cases involving the exemption from state taxation of property passing through a state, or out of one state into another state, or to foreign countries. Once it is shown that property has begun movement in interstate commerce and the continuity of transit has not been interrupted, the property is exempt from taxation by the various states through which it passes. Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 67 L. Ed. 309, and Kelley v. Rhoads, 188 U. S. 1, 47 L. Ed. 359.

It is only when the movement in interstate commerce has been interrupted and the property discontinues such movement under such circumstances as will enable the courts to say from all of the facts that such property has acquired a taxable situs within the laws of the particular state that such property becomes taxable or loses the exemption which it acquired by passing into interstate commerce. See cases cited in two preceding paragraphs. It was said by the Supreme Court of the United States in Champlain Realty Co. v. Town of Brattleboro, supra, that this rule should be used:

"The question of continuity of transit which will exempt property moving in interstate commerce from local taxation is to be determined by the various factors in the situation, among which are the intention of the owner, * * * and the occasion or purpose of the interruption during which the tax is sought to be levied."

Certain other factors were enumerated therein, but were eliminated from the rule as not applicable to this situation.

This oil was produced in Oklahoma. From the record we believe it had passed into the channels of interstate commerce. But we also believe, and find, that the continuity of movement in interstate commerce had been broken, that it had come to rest, and acquired a taxable situs.

The delivery of the oil to the pipe line and its method of handling it (commingling with oil of others, loss of identity, loss by leakage in handling, the pipe line's privilege of delivering the same quality of

a like grade) were known to and acquiesced in by plaintiff, and did not necessarily constitute a change of title as distinguished from a bailment. The stoppage and storage of this oil for long periods of time, in the tanks of the plaintiff, even if primarily for the benefit of the pipe line in the efficiency of its operations, were known to plaintiff, were acquiesced in by it, and it kept daily records of the location of the volumes and grades of oil in the possession of the pipe line corresponding to the difference between its tenders and withdrawals. There is no proof of the existence of a contract between plaintiff and the pipe line regarding the use or storage of the oil in these tanks belonging to plaintiff.

The acquiescence of a parent corporation in the use of its property by its subsidiary corporation in the rendition of services by the subsidiary for the parent and others will be given its proper legal significance when the property is sought to be taxed, even though such use may be inconsistent with the purpose for which the property was delivered by the parent to its subsidiary. The retention of this oil over such a period of time, to meet the exigencies of a contingency, definitely terminated its character as interstate commerce.

The judgment of the trial court is reversed, with directions to grant a certificate of erroneous assessment as to 274,937 barrels of oil, the difference between 975,-165 returned and 700,228, shown to be in storage as of January 1, 1930, by exhibit 9, case-made 326, and for such other steps as may be in keeping with the views expressed herein.

McNEILL, C. J., concurs specially, and RILEY, WELCH, and CORN, JJ., concur. PHELPS, J., concurs in part and dissents in part. GIBSON, J., concurs in Justice PHELPS' views. OSBORN, V. C. J., disqualified and not participating; and BUSBY, J., absent.

PHELPS, J. I concur in that part of the opinion embraced in the first paragraph of the syllabus, but dissent as to the remainder for the reason that, in my opinion, the record shows that the oil in question was in course of interstate shipment and, therefore, not subject to taxation.

GIBSON, J., concurs.

McNEILL, C. J. (specially concurring). I concur in the conclusion which has been reached as to taxability of the oil in question because it appears to me that the oil was held in storage longer than was reason-

ably necessary to its proper and orderly transportation. The facts at bar do not bring this case within the rule announced in Kelley v. Rhoads, 188 U. S. 1, 47 L. Ed. 359.