2008 OK 94

**In the Matter of the ASSESSMENT OF PERSONAL PROPERTY TAXES AGAINST MISSOURI GAS ENERGY, a DIVISION OF SOUTHERN UNION COMPANY, FOR TAX YEARS 1998, 1999, AND 2000.**

No. 103,355.

Supreme Court of Oklahoma.

Oct. 21, 2008.

Rehearing Denied Feb. 23, 2009.

Mart Tisdal and Luke Adams, Tisdal Law Firm, Clinton, OK and Hollis Thorp, Woods County Assistant District Attorney, Alva, OK, for Appellant.

William K. Elias and Linda Jo Blan–Byford, Elias, Books, Brown & Nelson, P.C., Oklahoma City, OK, for Appellee.

Julie L. Miller, Craig A. Crimmins, and Shelley A. Shelby, Oklahoma State School Boards Association, Oklahoma City, OK, for Amici Curiae, Oklahoma State School Boards Association and Cooperative Council for Oklahoma School Administration.[1]

OPALA, J.

¶1 The dispositive issues tendered on appeal are: (1) Did Assessor prove that the assessed property had a tax situs in Woods County? (2) Did Assessor prove that Missouri Gas Energy owned the assessed property? (3) Is the assessed natural gas tangible personal property for purposes of ad valorem taxation? (4) Does the challenged tax violate the Commerce Clause of the United States Constitution? and (5) Does the challenged tax violate the Freeport Exemption of the Oklahoma Constitution? We answer the first three questions in the affirmative and the last two questions in the negative.

I

THE ANATOMY OF LITIGATION

¶2 Missouri Gas Energy ("MGE" or "the Company") is a local gas distribution company whose principal place of business is in Kansas City, Missouri. It is regulated by the Missouri Public Service Commission. MGE purchases natural gas from suppliers in Texas, Kansas and Oklahoma and contracts with Panhandle Eastern Pipeline Company ("Panhandle"), an interstate common carrier of natural gas, for transportation of the gas to the state of Missouri. There the gas is sold to MGE's customers. MGE sells no gas in Oklahoma and maintains no facilities or employees in this state. In the process of being transported, some natural gas is removed from the pipeline and placed in storage facilities belonging to Panhandle. One such storage facility, North Hopeton, is located in Woods County.

¶3 Assessor learned in 2000 that Panhandle was storing natural gas at North Hopeton at the behest of shippers using Panhandle's pipeline for transportation of their gas to market. Assessor concluded that the gas being stored at North Hopeton was subject to ad valorem taxation in Woods County. She requested from Panhandle a list of shippers who had gas stored at North Hopeton as of 1 January 1998, 1999, and 2000 and the amount of gas held in storage for each. Panhandle did not generate this information in the ordinary course of business, but in response to Assessor's request, assembled a list of its shippers and allocated to each a portion of the gas stored at North Hopeton. Based on this information, Assessor levied the ad valorem tax at issue in this case.

¶4 MGE protested the assessment in an informal proceeding before Assessor. Assessor rejected the protest and MGE appealed to the Woods County Board of Equalization, which upheld Assessor's decision. MGE filed a petition in the Woods County District Court on 26 June 2002, initiating an appeal from the Board's decision by trial *de novo* pursuant to the provisions of 68 O.S.2001 § 2880.1.[2] MGE's appeal challenged the assessment on both state- and federal-law grounds.

"A. Both the taxpayer and the county assessor shall have the right of appeal from any order of the county board of equalization to the district court of the same county, ... In case of appeal the trial in the district court shall be de novo ...."

---

1. Identified herein are only counsel for the parties who have entered an appearance in this cause (as required by Okla. Sup.Ct. Rule 1.5(a), 12 O.S.2001, Ch. 15, App. 1) and whose names appear on the appellate briefs.

2. The pertinent provisions of 68 O.S.2001 § 2880.1 state:

¶ 5 MGE moved in the district court for summary judgment, which was denied. The trial court then bifurcated the proceedings for sequential bench trials. In the first trial, held on 10 August 2004, the trial judge heard testimony on whether the challenged assessments violated the Freeport Exemption of the Oklahoma Constitution, Article 10, § 6A.[3] After ruling that the Freeport Exemption was inapplicable, the trial court on 27 February 2006 heard testimony on the remaining state- and federal-law issues. On 19 April 2006, the trial court pronounced judgment in favor of MGE and ordered Woods County officials to refund to the Company any taxes paid under protest together with all accrued interest. Assessor appealed. The cause stands retained for this court's disposition. We now reverse the trial court's judgment.

## II

### THE TRANSPORTATION AND STORAGE OF NATURAL GAS

¶ 6 Panhandle operates an interstate natural gas pipeline system, which is regulated by the Federal Energy Regulatory Commission ("FERC"). The Panhandle pipeline system begins in what is called the Field Zone[4] in Texas and Oklahoma and consists of pipeline branches or legs connected at metered receipt points with the sources of gas supply located in those states. The branch traversing Texas has no physical connection with the branch traversing Oklahoma until they converge into a single pipeline at a compressor station located in Haven, Kansas.

¶ 7 Shippers purchase gas from suppliers in the Field Zone and contract with Panhandle for its transportation to market. Suppliers deliver the purchased natural gas into one of the branches or legs of the system at one of the metered receipt points. Multiple shippers use the pipeline simultaneously and all of their gas is commingled. Neither Panhandle nor the shippers attempt to trace gas belonging to individual shippers. Tracing of individual molecules of natural gas is physically impossible from the moment the gas enters the pipeline at the supplier's facility. A series of compressor stations along the pipeline create a pressure drop which causes the gas to physically move, eventually arriving at a metered delivery points in the Market Zone[5] from which it is sold to consumers. Gas originating in Oklahoma travels through Woods County to get to the Haven convergence point.

¶ 8 In addition to transporting gas directly from the Field Zone to the Market Zone, Panhandle offers a storage service to its shippers, the terms of which are set out in storage contracts. Panhandle has two natural gas storage facilities in the Field Zone: the Borchers Storage Facility located in Kansas on the branch of the pipeline originating in Texas and the North Hopeton Storage Facility located in Woods County, Oklahoma, on the Oklahoma branch of the pipeline.

¶ 9 The transportation and storage of natural gas is subject to certain physical laws that govern its movement. Movement is caused by displacement of gas in the system, not by the actual movement of specific molecules from points of receipt to points of delivery. Gas in a pipeline moves in only one direction: from an area of higher pressure to one of lower pressure. In geographical terms, gas in Panhandle's pipeline moves only from the Field Zone toward the Market Zone and never in the opposite direction. Molecules of gas that have passed either of the Field Zone storage facilities cannot physically turn around and end up in storage, nor can gas molecules purchased from a supplier on one branch of the pipeline system end up in storage at the storage facility on the other branch.

¶ 10 The storage facilities operate on an injection-withdrawal cycle that matches the weather-related demand for natural gas. From April through November, when de-

3. For the terms of the Freeport Exemption, see text at ¶ 67.

4. The Field Zone is the geographic area where natural gas is produced and gathered for sale to gas distributors.

5. The Market Zone is the geographic area where gas is sold to consumers.

mand for natural gas is relatively low, gas is injected into the storage facilities. During the winter months, from November through March, gas is withdrawn. Just as in the pipeline itself, all gas in storage is commingled and incapable of being traced to a particular shipper.

¶ 11 Natural gas transactions are executed by means of a computerized scheduling system in which "nominations" are made. A supplier posts on the scheduling system that it will deliver a volume of gas for a shipper's account and the shipper posts on the scheduling system a confirmation that it will receive that quantity of gas from that supplier. At the same time, the shipper uses the scheduling system to arrange for transportation of the gas under a transportation contract and designates where that gas will be delivered. In commensurate, simultaneous transactions, Panhandle can receive into its pipeline the volume of gas purchased by a shipper and deliver a thermally equivalent volume of gas to the same shipper at a delivery point hundreds of miles away. The molecules of gas delivered by the pipeline to the shipper at the delivery point are clearly not the same molecules of gas that the supplier put into the system at the shipper's request.

¶ 12 Shippers also use the scheduling system to nominate gas into storage. In making storage nominations, *shippers cannot specify which storage facility is to receive the gas nominated into storage.* Although there is not always a direct correlation between nominations into storage and actual injections, the net effect of the process is that a volume of gas equivalent to that nominated is received into whichever storage facility Panhandle determines needs the injection based on a timely analysis of its system's needs. The molecules of gas that go into a storage facility upon a shipper's nomination are very unlikely to be the same molecules purchased by that shipper, but there is no way to know as neither the purchased nor the stored molecules are traceable. Operationally, the pipeline and the storage customer care only that the volume of gas nominated into storage goes into storage.

¶ 13 Similarly, when a shipper nominates gas out of storage, it cannot specify from which storage facility the gas is to be taken. Panhandle can take gas from either storage facility depending on its system's needs. Its obligation is simply to provide its storage customer with gas. In terms of their relationship with each other, neither Panhandle nor the storage customer cares from which facility the gas is removed. The molecules taken out of storage could be molecules originally purchased by the shipper, but they are just as likely, probably more likely, to be molecules originally purchased by another shipper. It is impossible to know the original purchaser of any molecules removed from storage.

¶ 14 Panhandle keeps track of each shipper's storage transactions by means of a storage account. If the nomination is into storage, the shipper's storage account balance is increased; if the nomination is out of storage, its storage account balance is decreased. Panhandle keeps a single storage account balance for each shipper for gas held in storage at Borchers and North Hopeton combined. Panhandle does not account separately for each storage facility.

¶ 15 Although the actual molecules of gas held in a storage facility would not have traveled as far as Haven when they were removed from the pipeline and placed into storage, the parties treat the storage transactions as having taken place at Haven. When gas is withdrawn from storage, it is treated by the parties' transportation contracts as restarting its journey from Haven, not from one of the storage facilities.

¶ 16 The transportation process creates a complete disassociation between ownership of the gas in the system on the one hand and possession and control of the gas on the other. While Panhandle takes possession of gas placed into its pipeline and controls its movement, including the determination of which facility will receive storage gas, it never acquires title to the gas. Title to the gas from receipt into the pipeline to delivery at the point of consumption remains at all times in the shipper, but the shipper has absolutely no control over the movement of its gas in the pipeline.

## III

## STANDARD OF REVIEW

¶ 17 Selection of the appropriate standard of appellate review requires the correct characterization of the trial court proceedings.[6] The trial court proceeding in this case was neither an action at law nor a suit in equity, but rather a special statutory proceeding for the purpose of ascertaining whether a taxpayer is entitled to a refund of a tax paid under protest.[7] Accordingly, the trial court's judgment should be affirmed unless it is against the clear weight of the evidence or is contrary to law or to established principles of equity. The trial court's statutory construction is always reviewed *de novo*[8] and its application of the law to the facts in resolving mixed questions of law and fact is reviewed as a question of law.[9]

## IV

## THE CHALLENGED TAX WAS LEVIED UPON GAS STORED IN WOODS COUNTY AND NOT UPON AN INTANGIBLE INTEREST IN THAT GAS

¶ 18 While agreeing that natural gas is tangible personal property, MGE contends that the assessment at issue is not on the gas itself, but rather upon MGE's *interest* in the gas, which MGE characterizes as intangible personal property in the form of either an account receivable or a deposit. MGE argues that the contested assessment is invalid because both accounts receivable and deposits are exempt from ad valorem taxation under the provisions of Article X, § 6A of the Oklahoma Constitution.[10] Assessor responds that the levy is upon the gas itself, which is tangible personal property. The trial court treated the assessment as one on tangible personal property.

¶ 19 MGE's argument calls for an interpretation of the meaning of certain terms used in § 6A of Article 10 of our fundamental law. That provision exempts "accounts and bills receivable, brokerage accounts, and credits, whether secured or unsecured." The constitutional text does not define any of these terms. In determining their meaning, we must bear in mind that a constitution is not made for the parsing of lawyers, but for the instruction of the people so that they may read and understand their rights and their duties.[11] The words used in a constitutional provision are hence to be construed in a way that is most familiar to the ordinary people who adopted it.[12] "Words which do not of themselves denote that they are used in a technical sense, are to

**6.** *Patel v. O.M.H. Med. Ctr., Inc.*, 1999 OK 33, ¶ 17, 987 P.2d 1185, 1192, *cert. denied*, 528 U.S. 1188, 120 S.Ct. 1242, 146 L.Ed.2d 100 (2000).

**7.** A special proceeding differs from other civil actions in the manner of pleading, practice and procedure prescribed by law. Special proceedings are not governed by the general regime of pleadings. *Ward Petroleum Corp. v. Stewart*, 2003 OK 11, ¶ 7, 64 P.3d 1113, 1115; *City of Tahlequah v. Lake Region Elec., Co-op., Inc.*, 2002 OK 2, ¶ 4, 47 P.3d 467, 474 (Opala, J., joined by Watt, V.C.J., and Kauger and Summers, JJ., dissenting).

**8.** *State of Okla. ex rel. Dep't of Human Services ex rel. Jones v. Baggett*, 1999 OK 68, ¶ 4, 990 P.2d 235, 238; *In re Estate of Nelson*, 2007 OK CIV APP 81, ¶ 6, 168 P.3d 235, 238; *Weeks v. Cessna Aircraft Co.*, 1994 OK CIV APP 171, ¶ 5, 895 P.2d 731, 732 (*approved for publication* by Order of the Oklahoma Supreme Court).

**9.** *Ellington v. Horwitz Enterprises*, 2003 OK 37, ¶ 4, 68 P.3d 983, 984; *Taylor v. City of Okla. City*, 1989 OK 129, ¶ 7, 782 P.2d 1363, 1365.

**10.** The provisions of Article 10, § 6(A), OKLA. CONST., state in pertinent part:

"Intangible personal property as below defined shall not be subject to ad valorem tax or to any other tax in lieu of ad valorem tax within this State:

* * *

(c) Accounts and bills receivable, including brokerage accounts, and other credits, whether secured or unsecured.

* * *

(f) All interests in property held in trust or on deposit within or without this State, and whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership."

**11.** *Carter v. Rathburn*, 1922 OK 105, ¶ 39, 209 P. 944, 953.

**12.** *Id.*

have their plain, popular, obvious, and natural meaning; ..." [13]

■ ¶ 20 With these rules of construction in mind, we consider the meaning of the words used in § 6A. The word "receivables," as in "accounts receivable," is ordinarily understood in business to mean "amounts of *money* due to a business from customers." [14] (emphasis added) The Uniform Commercial Code defines an account as a right to payment of *a monetary obligation* for the sale or lease of property or for services rendered.[15] The relationship between parties to an account receivable is one of debtor and creditor.[16] The common meaning of debt is *money* owed in exchange for goods or services purchased on credit.[17] A brokerage account is an arrangement between an investor and a brokerage firm in which the investor deposits money with the firm and places investment orders through the brokerage. In exchange for these services, the investor owes the firm a commission. The brokerage firm may hold funds or other property belonging to the investor, but as the investor's agent, not as a debtor. The term "credit" in ordinary usage means the right granted by a creditor to a debtor to defer payment of a monetary obligation.[18] While there are obvious and distinct differences between the broker-investor relationship and the debtor-creditor relationship, in each case one party receives something in exchange for the deferred payment of money to the other party.

■ ¶ 21 MGE would have us treat Panhandle's obligation to deliver gas to MGE as a debt which, in MGE's hands, forms an account receivable. In this scenario, MGE is in the position of an account creditor *vis-à-vis* Panhandle who, as account debtor, owes a debt to MGE payable, not in the form of money, but in the form of gas in whatever volumes MGE nominates out of storage. We cannot accede to this characterization of the parties' relationship or of Panhandle's obligation to MGE as being one in the nature of debt.

¶ 22 Under its storage contracts and according to the federal Tariffs that govern interstate gas transportation and storage, MGE *purchased storage services* from Panhandle. The contracts provide that MGE will pay Panhandle the effective, applicable rates under the Tariffs in exchange for the services provided by Panhandle. MGE had a

13. *Id.*

14. The Penguin Dictionary of Accounting 243 (1st ed.2002); Joel G. Seigel & Jae K. Shim, Dictionary Of Accounting Terms 11 (3d ed.2000) ("amounts due [a business] on account from customers who have bought merchandise or received services."); *Tingey v. Haisch*, 159 Wash.2d 652, 152 P.3d 1020, 1024 (2007) ("Obtaining the definition of "account receivable" from a technical business dictionary is consistent with plain meaning analysis.").

15. 12A O.S.2001 § 1–9–102(a)(2)(A):

"'Account', except as used in 'account for', means a right to payment of a monetary obligation, whether or not earned by performance: (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; (ii) for services rendered or to be rendered; ..."

16. *Resolution Trust Corp. v. Greer*, 1995 OK 126, ¶ 18, 911 P.2d 257, 263.

17. *Price v. Mize*, 1981 OK 49, ¶ 5, 628 P.2d 705, 706 ("A debt is a sum of money due upon either an express or an implied contract."). *See* the provisions of 24 O.S.2001 §§ 1 and 2, and 25 O.S.2001 § 8, which construed together provide that a debtor's obligation and a creditor's entitlement is to the payment of money. The provisions of 25 O.S.2001 § 8 state in pertinent part: "... every one who owes to another the performance of an obligation is called a debtor, and one to whom he owes it is called a creditor." The debtor/creditor status is further defined in 24 O.S.1991 § 1, whose terms define a debtor as: "... one who, by reason of an existing obligation, is, or may become, liable to pay money to another, whether such liability is certain or contingent." A creditor is correspondingly defined in the provisions of 24 O.S.2001 § 2, as: "... one in whose favor an obligation exists, by reason of which he is, or may become, entitled to the payment of money."

18. The word "credit" is used in a variety of contexts and is associated with such terms as consumer credit, tax credit, line of credit, extension of credit, full faith and credit, federal credit, confirmed credit, transfer credit, offer of credit, etc. For example, the Oklahoma Consumer Credit Code defines credit in substantially the form which we employ here. *See* 14A O.S.2001 1–301(7), which states: "'Credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."

right to performance of the purchased services, including the timely withdrawal of the gas from storage and its delivery to Missouri. This right to Panhandle's performance of its obligations under the storage contracts was not an account receivable as that term is used in § 6A and Panhandle's obligation was not a debt. A debtor holds title to the thing owed. The record is clear in this case that title to the gas remained at all times in MGE and was never transferred to Panhandle.

¶ 23 Nor are we persuaded that the tax is invalid because levied upon an exempt deposit. MGE refers us to a provision of our state's constitution that exempts from ad valorem taxation "[a]ll interests in property held in trust or on deposit within or without this State, and whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership." [19] MGE relies on a definition of the word "deposit" found in *Black's Law Dictionary* (5th ed.1979), which broadly defines deposit to include a bailment of goods.[20] MGE argues that its contractual storage arrangement with Panhandle is, or is similar enough to, a bailment to characterize its interest in the gas stored at North Hopeton as an interest in property on deposit. We disagree.

¶ 24 The constitutional exemption created in Article 10, § 6A(f), adopted in 1968, abolished the intangible tax which had been imposed by 68 O.S. Supp.1965 § 2501. An examination of the entire provision reveals that it was not the people's intent in passing it to bar the taxation of bailed corporeal property. The exemption provides that an interest in property is exempt, "whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership." The

intent was to prohibit taxation of a beneficial interest which may be held in a trust res or on deposit.[21]

¶ 25 MGE's relationship with Panhandle did not create a division of title to the stored gas, in which Panhandle had legal title and MGE beneficial title. Nothing in the record suggests that MGE had anything less than unified title to the gas it nominated into storage. "Bailment is the transfer of 'the possession of personal property without the transfer of ownership for the accomplishment of a certain purpose.'" [22] Hence, MGE's interest in the storage gas was not a beneficial interest held in trust or on deposit within the meaning of the constitutional exemption.

## V

### NATURAL GAS STORED AT NORTH HOPETON HAS A TAXABLE SITUS IN WOODS COUNTY

¶ 26 The record clearly shows that natural gas was physically stored at North Hopeton and that a certain volume of gas was present there on the assessment dates at issue. The trial court nevertheless concluded that natural gas held in storage at North Hopeton could not acquire a tax situs in this state because gas stored pending transportation out of state is in transit in interstate commerce.

¶ 27 MGE argues that both state and federal law support the trial court's conclusion that property in interstate commerce cannot have a tax situs in a particular state. MGE first argues that the provisions of 68 O.S. 2001 § 2831(E) apply to its storage gas and bar its acquisition of tax situs in Oklahoma. That statute states in pertinent part: "Tangi-

---

19. Article 10, § 6A(f), OKLA. CONST. *See supra* note 10.

20. That definition states in pertinent part: "A bailment of goods to be kept by the bailee without reward, and delivered according to the object or purpose of the original trust. In general, an act by which a person received the property of another, binding himself to preserve it and return it in kind.... The giving of the possession of personal property by one person to another, with his consent, to keep for the use and benefit of the first or a third person." *See* BLACK'S LAW DICTIONARY 394 (5th ed.1979).

21. *State ex rel. Cartwright v. Dunbar*, 1980 OK 15, ¶ 39, 618 P.2d 900, 910.

22. *Essex v. Fife*, 1917 OK 526, ¶ 3, 168 P. 814, 815; *Broaddus v. Commercial Nat. Bank of Muskogee*, 1925 OK 527, ¶ 9, 237 P. 583, 584 (defining bailment as "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it as the case may be.").

ble personal property moving through the state from a point outside the state, in transit to a final destination outside the state, shall for purposes of taxation, acquire no situs in the state...." The statute applies to (1) tangible personal property (2) in transit through Oklahoma (3) from a point outside Oklahoma (4) to a final destination outside of Oklahoma. MGE contends that its storage gas meets all four of these requirements. Assessor argues that it is not in transit from a point outside of Oklahoma.

¶ 28 The trial court found that all the gas stored at North Hopeton originates within the state of Oklahoma. That finding is supported by ample evidence and is sufficient to remove the gas from the reach of this statute. For the reasons stated later in this opinion, the fact that the assessment was based upon an allocation to each shipper of the gas stored at North Hopeton does not alter the fact that all the gas stored in that facility physically originated in this state.

¶ 29 MGE also argues that gas stored at North Hopeton does not have a tax situs in Oklahoma under federal law because it is in interstate commerce. Whether property has a tax situs in a particular state is a question of due process.[23] The United States Supreme Court has described the necessary connection between property to be taxed and the taxing jurisdiction for purposes of due process as follows:

"When we speak of the jurisdiction to tax land or chattels as being exclusively in the state where they are physically located, we mean no more than that the benefit and protection of laws enabling the owner to enjoy the fruits of his ownership and the power to reach effectively the interests protected, for the purpose of subjecting them to payment of a tax, are so narrowly restricted to the state in whose territory the physical property is located as to set practical limits to taxation by others."[24]

The Court has also said simply that "a state tax comports with the Due Process Clause if 'the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state' "[25] The relevant question is whether the property sought to be taxed has sufficient contact with the taxing jurisdiction to provide a fair basis for the levy.[26]

¶ 30 Instead of considering whether the gas held in storage at North Hopeton had the kinds of contacts with the state making state taxation "fair," the trial court concluded that because the gas stored at North Hopeton is in interstate commerce, it cannot have a tax situs in Oklahoma. There is a great deal of confusion in this area because the term tax situs has often been used in deciding that a tax does or does not conform to the strictures of the Commerce Clause.[27] In doing so, courts have blurred the distinction between the Due Process and Commerce Clauses of the Constitution as they apply to

23. *Braniff Airways v. Nebraska State Bd. of Equalization and Assessment,* 347 U.S. 590, 599, 74 S.Ct. 757, 763, 98 L.Ed. 967 (1954); *Johnson Oil Refining Co. v. State of Okla.,* 290 U.S. 158, 162, 54 S.Ct. 152, 154, 78 L.Ed. 238 (1933); *Frick v. Commonwealth of Pennsylvania,* 268 U.S. 473, 488–89, 45 S.Ct. 603, 604, 69 L.Ed. 1058 (1925); *Union Refrigerator Transit Co. v. Commonwealth of Kentucky,* 199 U.S. 194, 202–03, 26 S.Ct. 36, 37, 50 L.Ed. 150 (1905); *Delaware, L. & W.R. Co. v. Commonwealth of Pennsylvania,* 198 U.S. 341, 358, 25 S.Ct. 669, 674, 49 L.Ed. 1077 (1905).

24. *Curry v. McCanless,* 307 U.S. 357, 364, 59 S.Ct. 900, 904, 83 L.Ed. 1339 (1939).

25. *R.J. Reynolds Tobacco Co. v. Durham County, North Carolina,* 479 U.S. 130, 156, 107 S.Ct. 499, 515, 93 L.Ed.2d 449 (1986), *quoting Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246,

249, 249–50, 85 L.Ed. 267 (1940) ("A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.").

26. *Town of Cady v. Alexander Const. Co.,* 12 Wis.2d 236, 107 N.W.2d 267, 270 (1961) ("Perhaps the concept of situs for tax purposes ... means no more than [that] the state [in which] the personal property is physically present must have sufficient contact or relationship with the property in order to form in fairness a basis for taxing it.").

27. *See e.g.,* this court's decision in *Magnolia Petroleum Co. v. Bd. of County Comm'rs of McClain County,* 1936 OK 527, 63 P.2d 6.

the power of the states to levy a tax on commerce between the states.

¶ 31 The United States Supreme Court has addressed this conflation of the two constitutional provisions, saying that while it has treated whether property in transit in interstate commerce has sufficiently come to rest in a state for purposes of subjection to a property tax as a Commerce Clause question, the bare question whether such property has tax situs in a state for the purpose of subjection to a property tax is one of due process.[28] The central concern of the Due Process Clause is the fundamental fairness of governmental activity, not the protection of interstate commerce from discrimination.[29]

¶ 32 While the Due Process Clause and the Commerce Clause operate in tandem "to maintain and advance the idea of a national and international economy," [30] the analytical framework for determining conformity to the two provisions is not identical. Both provisions have a requirement that there be a nexus between the property to be taxed and the taxing state. Under the Due Process Clause, that nexus requirement is minimal, while under the Commerce Clause it is substantial. We hold that despite the parties' intention that MGE's stored natural gas will ultimately be delivered to Missouri, its sojourn in storage in Oklahoma gives it at least a minimal nexus to this state sufficient to establish tax situs and to survive a due process attack.

¶ 33 The record in this case shows that large volumes of gas are stored in Woods County for a substantial part of the year, being gradually injected for months and then being gradually withdrawn over another period of months. The contested assessment is not a tax on property that is *merely* passing

through Woods County to an out-of-state destination. It is a tax on tangible personal property actually located in Woods County on the assessment dates.[31] The stored volumes of gas receive the continuous protection, benefits and opportunities afforded by the state and county throughout the tax year. While the volume of gas present at North Hopeton fluctuates, some volume is there at all times. Even if the gas is "in transit" in interstate commerce for federal regulatory purposes, it is present in Woods County with a sufficient degree of permanence to satisfy the dictates of due process.

## VI

### THE NATURAL GAS STORED AT NORTH HOPETON IS OWNED IN COMMON BY ALL SHIPPERS WITH STORAGE VOLUMES ON THE PANHANDLE PIPELINE SYSTEM

¶ 34 While MGE agrees that it owns natural gas in the Panhandle system and that gas is stored at North Hopeton, it denies that Assessor has proved that it owned even a single molecule of gas stored at North Hopeton on the assessment dates. The trial court agreed, concluding that Assessor had produced no documentary evidence establishing that MGE had title to the assessed volumes of gas and that the allocations provided by Panhandle are not themselves evidence of ownership. The trial court further found that there was no correlation between the volumes of gas MGE placed into the system on the pipeline leg connected to North Hopeton, the only gas that could physically be placed into storage there, and the volumes of gas assessed. MGE contends that these *nisi prius* findings and conclusions are supported

28. *Braniff Airways v. Nebraska State Bd. of Equalization, supra* note 23 at 598–99, 74 S.Ct. 757 (referring to a property tax on aircraft, an instrumentality of interstate commerce).

29. *Quill Corp. v. North Dakota*, 504 U.S. 298, 312, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992).

30. 14A Fletcher Cyclopedia of the Law of Corporations § 6912.

31. *See* the provisions of 68 O.S.2001 § 2831(a), which state in pertinent part:

"All property, both real and personal, having an actual, constructive or taxable situs in this state, shall, except as hereinafter provided, be listed and assessed and taxable in the county, school districts, and municipal subdivision thereof, where actually located on the first day of January of each year."

by substantial evidence and must be affirmed.

¶ 35 MGE reminds us that from the moment gas enters the pipeline at the suppliers' facility, it is commingled with every other molecule of gas already in the pipeline. MGE contends that it owns particular molecules of gas, but because individual molecules of gas cannot be traced, Panhandle does not and cannot quantify a volume of gas and identify a particular shipper as that volume's owner. Thus MGE contends that while it owns gas in the system, its ownership of gas at any particular location on the system cannot be proved.

¶ 36 Assessor argues that it does not have to prove the location of any particular molecules of gas to assess MGE for gas stored at North Hopeton. Assessor contends that MGE is entitled to delivery of a volume of gas, not delivery of particular molecules, and that it owns the volume to which it is entitled without regard to where any particular molecules happen to be. She urges the court to hold that all gas in Field Zone storage, regardless of where it is stored, is owned in common by all shippers with positive storage account balances.

■ ¶ 37 We agree with Assessor. The record clearly shows that MGE took title to purchased gas at the wellhead and was deemed to be the owner of delivered gas at the point of ultimate consumption. At no point in the transportation or storage process did MGE transfer title to the gas to Panhandle. Either the shippers own the gas wherever it is in the system or no one owns it. The latter is untenable.

■ ¶ 38 The general rule is that where fungible goods belonging to different persons are so intermingled as to be undistinguishable, whether by consent of the owners or by someone's wrongful act, the owners become tenants in common of the mass.[32] The commingling of a fungible commodity does not affect ownership unless the parties intend to transfer title. The Uniform Commercial Code provides in the context of warehouse storage that fungible, commingled goods are owned in common.[33] Application of this rule averts the absurd result that ownership of gas can be established at the inception of the transportation process and at the end of the transportation process, regardless of the impossibility of tracing particular molecules of gas, but cannot be established in the course of the transportation process simply because molecules cannot be traced.

¶ 39 The trial court ruled that Panhandle's allocation of storage volumes to each shipper is not evidence of ownership. This is correct, but misconstrues the purpose of Panhandle's allocation. An "allocation" is "the action of apportioning," and to "apportion" means "to divide and assign in proportion" or "to divide and distribute proportionately."[34] Ownership is a condition precedent to an allocation; it is not proved by an allocation.

■ ¶ 40 Having concluded that gas held in Field Zone storage facilities is owned in common by all shippers, we turn now to whether Assessor established that the allocation formula she used reasonably apportions the gas stored at North Hopeton among shippers with positive storage account balances. Assessor contends that because access to gas in a particular storage facility is not limited to a shipper's purchases on the leg of the pipeline connected to that storage facility, the amount taxable to each shipper should be determined by an allocation to each storage facility of a portion of each shipper's system-wide storage account volume. The way the system works, each shipper is simply entitled to a volume of gas

---

32. *The Intermingled Cotton Cases,* 92 U.S. 651, 2 Otto 651, 23 L.Ed. 756 (1875); *Basin Elec. Power Co-op. v. ANR Western Coal Development Co.,* 105 F.3d 417 (8th Cir.1997) (and cases cited therein), *appeal after remand, ANR Western Coal Development Co. v. Basin Elec. Power Co-op.,* 276 F.3d 957, (8th Cir.2002); *Gilberton Contracting Co. v. Hook,* 267 F.Supp. 393 (D.Pa.1967); *McDonnell v. Bank of China,* 33 F.2d 816, 817 (9th Cir. 1929).

33. The provisions of 12A O.S.2001 § 7–207(b) state in pertinent part: "If different lots of fungible goods are commingled, the goods are owned in common by the persons entitled thereto and the warehouse is severally liable to each owner for that owner's share...."

34. Webster's Third New International Dictionary at 57 and 105, respectively (1961).

thermally equivalent to that which it placed into storage regardless of where it was placed when stored or from where it is taken when removed from storage. Consequently, Assessor argues, there is no need for there to be a correlation between the volumes purchased by MGE upstream of North Hopeton and the volumes upon which it is taxed.

¶ 41 The allocation Panhandle provided to Assessor was prepared in accordance with a provision of a FERC Tariff containing a formula for the calculation of storage volumes for state ad valorem tax purposes.[35] MGE argues that the existence of this formula in the FERC Tariff does not control the validity of the challenged tax under our fundamental and statutory law and we agree. While the FERC-approved state ad valorem tax allocation formula has no bearing on the validity of the challenged tax under our state's laws, it does, in the event a state determines that storage gas can be taxed ad valorem, present a reasonable allocation method approved by the federal regulatory agency with special knowledge of the workings of the natural gas industry in general and of the transportation and storage facets of the natural gas business. Assessor's expert witness, an independent accountant and auditor for the oil and gas industry, confirmed the accuracy of Panhandle's figures. The allocation formula used by Panhandle resulted in a proportionate distribution of storage volumes between storage facilities and among shippers with storage account balances. It is a fair and reasonable method of apportioning ownership among common owners.

## VII

### THE COMMERCE CLAUSE DOES NOT BAR THE CHALLENGED ASSESSMENT

■■ ¶ 42 The Commerce Clause, Article I, § 8, cl. 3, of the United States Constitution, expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." Its purpose is to create "an area of trade free from interference by the States." [36] Although the Commerce Clause says nothing about the protection of interstate commerce in the absence of action by Congress, it has long been recognized as having both an affirmative and a negative sweep.[37] By granting to Congress the power to regulate interstate commerce, the Commerce Clause by negative implication prohibits the states from enacting measures, including taxes, that advantage local business.[38]

■ ¶ 43 The United States Supreme Court's interpretation of the Commerce Clause in relation to the states' power to tax interstate commerce has evolved substantially and fitfully over the years.[39] The Court's

---

35. The FERC Tariff formula for the determination of storage inventories for state ad valorem taxes states:

   "For purposes of reporting Storage inventories for state ad valorem taxes, ... [i]nventories in Field Area Storage Facilities shall be allocated to all Shippers with inventories [under various FERC Tariff Rate Schedules], based on the ratio of total Storage inventories for the state divided by total Storage inventories for all states times the Shipper's total Stored Volume under such Rate Schedules."

36. *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977), *quoting Freeman v. Hewit,* 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946).

37. *Quill Corp. v. North Dakota, supra* note 29 at 309, 112 S.Ct. 1904.

38. *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179–80, 115 S.Ct. 1331, 1335–36, 131 L.Ed.2d 261 (1995).

39. Several of the justices have expressed impatience with the zigzag course of the Court's dormant Commerce Clause jurisprudence. Justice Souter has charitably described the Court's understanding of the dormant Commerce Clause as having "taken some turns." *Okla. Tax Comm'n v. Jefferson Lines, Inc., supra* note 38 at 180, 115 S.Ct. 1331 (Scalia, J., joined by Thomas, J., concurring in judgment). Justice Scalia has referred sartorially to the various tests created by the Court to implement the dormant Commerce Clause as "our wardrobe of ever-changing negative Commerce Clause fashions." *Am. Trucking Ass'ns, Inc., v. Michigan Public Service Comm'n,* 545 U.S. 429, 439, 125 S.Ct. 2419, 2426, 162 L.Ed.2d 407 (2005) (Scalia, J., concurring in judgment). He has called the Court's current test "eminently unhelpful" and has expressed his hope that it will someday take "its rightful place in Part II of the Court's opinion, among the other useless and discarded tools of our negative Commerce Clause jurisprudence." *Okla. Tax Comm'n v. Jefferson Lines, Inc., supra* note 38 at 201, 115 S.Ct. 1331 (Scalia, J., joined by Thom-

attitude toward state taxation of interstate commerce has alternated between a blanket prohibition and varying degrees of accommodation. In its 1977 opinion in *Complete Auto Transit, Inc. v. Brady*,[40] the Court fashioned a four-part test that continues today to govern the validity of state taxes under the Commerce Clause. A tax will be sustained under *Brady* against a Commerce Clause challenge if it (1) is applied to an activity with a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to services provided by the state.[41]

■■■ ¶ 44 Underlying the *Brady* analysis and contemporary Commerce Clause jurisprudence in general is the conviction that those engaged in interstate commerce must expect to pay their just share of state tax burdens.[42] The decisive issue is "whether the State has exerted its power in proper proportion to ... [taxpayer's] activities with-

in the State and to ... [taxpayer's] consequent enjoyment of the opportunities and protections which the State has afforded."[43] While the Court has applied the *Brady* test to many kinds of taxes,[44] it has never addressed whether the *Brady* test applies to an ad valorem tax on goods in the process of being transported in interstate commerce.

¶ 45 Because the Supreme Court has not yet decided a Commerce Clause challenge to an ad valorem tax on goods in the transportation process under *Brady*, the parties have suggested that we apply the test used prior to *Brady* when interstate commerce was held to be immune from state taxation. That test looked at whether there was an interruption in transit that took the goods out of interstate commerce. That determination was made based on subjective factors related to the reasons for the interruption in transit.[45] Today, as both MGE and Assessor recognize, even if MGE's storage gas is in transit in

as, J., concurring in judgment). Justice Stevens has acknowledged "the uneven course of decisions in this field." *Am. Trucking Ass'ns Inc. v. Scheiner*, 483 U.S. 266, 269, 107 S.Ct. 2829, 2832, 97 L.Ed.2d 226 (1987). Justice Thomas has noted the Court's "decades-long struggle over the meaning of the nontextual negative command of the dormant Commerce Clause." *U.S. v. International Business Machines Corp.*, 517 U.S. 843, 851, 116 S.Ct. 1793, 1799, 135 L.Ed.2d 124 (1996).

40. 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

41. *Id.* at 279, 97 S.Ct. 1076.

42. "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden[s]." *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality*, 511 U.S. 93, 102, 114 S.Ct. 1345, 1351, 128 L.Ed.2d 13 (1994), *quoting Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938).

43. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 625, 101 S.Ct. 2946, 2957, 69 L.Ed.2d 884 (1981), *quoting General Motors Corp. v. Washington*, 377 U.S. 436, 440–441, 84 S.Ct. 1564, 1568, 12 L.Ed.2d 430 (1964), *overruled on other grounds*, *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).

44. *Brady, supra* note 40 (privilege tax on the sale of transportation services); *Okla. Tax Comm'n v.*

*Jefferson Lines, Inc., supra* note 38 (sales tax on goods); *D.H. Holmes Co. Ltd. v. McNamara*, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988) (use tax on direct mail catalogs printed out of state); *Maryland v. Louisiana*, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) ("first-use" tax imposed on certain uses of natural gas brought into Louisiana); *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (corporate franchise tax); *Washington Dept. of Revenue v. Ass'n of Washington Stevedoring Cos.*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978) (business and occupation tax); *Commonwealth Edison Co. v. Montana, supra* note 43 (severance tax); *Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980) (corporate income tax applied to "foreign source" dividend income); *American Trucking Associations, Inc. v. Michigan Public Service Comm'n, supra* note 39 (annual fee on trucks engaged in intrastate commercial hauling); *Japan Line Ltd. v. Los Angeles County*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) (assuming that the *Brady* test is applicable to an ad valorem tax on instrumentalities of commerce (shipping containers) under the foreign Commerce Clause).

45. If the interruption was for the convenience or safety of the goods or for "transit reasons," the goods remained immune from taxation. If the interruption was for the owner's business purposes, such as to exercise the right to dispose of the goods, the opposite result was reached.

interstate commerce, that does not automatically mean that a tax levied against it would contravene the Commerce Clause because "interstate commerce may be required to pay its fair share of state taxes."[46] Correspondingly, a determination that MGE's storage gas is "at rest" in Oklahoma would not mean that it is beyond the reach of the Commerce Clause. "The Court has ... long since rejected any suggestion that a state tax or regulation affecting interstate commerce is immune from Commerce Clause scrutiny because it attaches only to a 'local' or intrastate activity."[47]

¶ 46 While the Supreme Court has cautioned state and lower federal courts to follow directly applicable precedents that may appear to have been rejected in some other line of cases and leave to it the prerogative of overruling its own decisions,[48] application of a traditional rule that leads only to the inconclusive result that goods are either in transit or at rest would not resolve the issue before us today. We will hence review the constitutionality of the tax in this case using the *Brady* analysis.

■ ¶ 47 MGE's task[49] at *nisi prius* was to prove by clear and convincing evidence that at least one of the four prongs of the *Brady* test was not met. The trial court concluded that the tax failed to meet any of the four prongs. We disagree and hold that the contested tax meets all four prongs of the *Brady* test and is valid under the Commerce Clause.

### A. First Prong—Substantial Nexus

■ ¶ 48 The first prong of the *Brady* test requires that there be a substantial nexus between the activity or property sought to be taxed and the taxing state. The trial court concluded that there was not such a nexus between MGE's storage gas and Woods County because the gas was at all times while in storage in the possession and control of a common carrier (Panhandle) and committed to being transported out of state.

¶ 49 MGE argues that its only contact with Oklahoma is its contractual relationship with Panhandle, a common carrier that transports the gas out of state and stores the gas as part of that process. According to MGE, the trial court was legally correct in concluding that this type of contact with Oklahoma was insufficient to establish a substantial nexus. MGE also argues that regardless of how long its gas is present in Woods County, it is always deemed by Federal Energy Regulatory Commission ("FERC") regulations to be "merely passing through the state" and therefore cannot have any nexus to Oklahoma, let alone a substantial one.

■ ¶ 50 The nexus requirement ensures that, with respect to goods in interstate commerce, a state will not be able to exact a fee simply for the privilege of passing through the state. If a state could tax such movement, every state through which goods passed could levy the same tax and the impact on the national economy would be grave.[50] MGE's storage gas cannot be characterized as goods that are merely passing through the state. Large volumes of gas are stored in Woods County for a substantial part of the year, being gradually injected for months and then being gradually withdrawn over another period of months. While the volume of gas increases and decreases over

---

46. *D.H. Holmes Co., Ltd. v. McNamara, supra* note 44 at 30–31, 108 S.Ct. 1619. Of course, goods that move continuously through a state in the course of an interstate journey without stopping are no more amenable to local taxation under *Brady* than they were under the historical analysis, but the reason is not simply that they are "in transit in interstate commerce." Rather, it is because their actual movement deprives them of the degree of nexus with the taxing state that would justify the tax under the first prong of the *Brady* analysis.

47. *Commonwealth Edison Co. v. Montana, supra* note 43 at 615, 101 S.Ct. 2946.

48. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989).

49. This case presents an "as applied" Commerce Clause challenge to the state's ad valorem tax. The burden of proof in a Commerce Clause challenge is on the taxpayer who must prove by clear and convincing evidence that application of the state statute to him or her violates the Commerce Clause.

50. *Quill Corp., supra* note 29 at 312, 112 S.Ct. 1904.

the year, some volume is stored in the county at all times during the year. The gas in storage at North Hopeton thus has a substantial presence in Woods County and is not in transit in such a way as to invoke the protection of the Commerce Clause.

¶ 51 To the extent that the subjective factors critical to the *Blasius* analysis retain a role under the *Brady* test, they cut both ways on the question of nexus. The record indicates that MGE and Panhandle each has its own independent reasons for storing gas. A pipeline can only move so much gas at a time and there would be insufficient gas to meet peak winter demand if gas were not stored. This is critical to both the carrier and the shipper. For MGE, storage allows it to accumulate gas when demand is low so that it can fulfill its customers' needs and meet the requirements of state (Missouri) regulators for gas during the winter. For Panhandle, storage is used to maintain pressure in its system, which is the force that moves gas through the pipe.

¶ 52 The record shows that MGE had no control over the gas in storage other than the timing of its return to the pipeline for further transportation, nor did MGE have the ability to alter the ultimate destination of the gas. Nevertheless, storage of gas is not only anticipated by MGE, but intended. While MGE cannot direct the pipeline to use the Woods County facility, it contracts for storage knowing that the Woods County facility is one of two Field Zone storage facilities. If gas is stored there, and it is, MGE cannot claim it does not intend for that to happen. Were the court making the old "in transit" or "at rest" determination, this record would make that determination very difficult. Inasmuch as the subjective factors are inconclusive, the nexus issue is better decided on the basis of the objective fact that Panhandle stored gas on behalf of MGE and that a certain amount of it was held at North Hopeton at all times during the tax years in question.

¶ 53 The trial court concluded that when a party's only contacts with a taxing state are by mail or common carrier, a substantial nexus is lacking as a matter of law. This rule was fashioned by the Supreme Court in *National Bellas Hess, Inc. v. Department of Revenue of Illinois.*[51] There the Court held that mail-order sellers without a physical presence in a state do not have a substantial nexus with the state if they do no more than communicate with customers in the taxing state by mail or common carrier. The common carrier in *National Bellas Hess* was the telephone. We do not view MGE's contacts with the state of Oklahoma through storage at the North Hopeton facility as analogous to the communications made by means of telephone found in *National Bellas Hess.* Unlike the sporadic communications with random consumers in a state deemed lacking in *National Bellas Hess,* MGE's storage gas has a substantial physical presence in the state throughout the year.

¶ 54 MGE next points out that federal law designates storage as part of the process of transporting natural gas between states and concludes that gas in storage is *per se* in transit in interstate commerce under federal law. Accordingly, MGE argues, this court must view gas in storage as "merely passing through the state" regardless of the actual circumstances of its storage. MGE cites a number of cases in which federal courts have indeed recognized that storage of natural gas is an important component of interstate gas transportation,[52] but none of the cited cases bears on the question of whether the taxation of stored gas destined to be shipped out of state conforms to the Commerce Clause.[53]

¶ 55 MGE next cites a FERC regulation that defines the transportation of natural gas

---

**51.** 386 U.S. 753, 758, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled on other grounds by Quill Corp. v. North Dakota, supra* note 29; *Nat'l Geographic Society v. Cal. Bd. of Equalization,* 430 U.S. 551, 559, 97 S.Ct. 1386, 1392, 51 L.Ed.2d 631 (1977).

**52.** *Columbia Gas Transmission Corp. v. Exclusive Gas Storage Easement,* 776 F.2d 125, 129 (6th Cir.1985); *Schneidewind v. ANR Pipeline Co.,*

485 U.S. 293, 295, n. 1, 108 S.Ct. 1145, 1148, n. 1, 99 L.Ed.2d 316 (1988).

**53.** *Columbia Gas Transmission Corp. v. Exclusive Gas Storage Easement, supra* note 52 at 129 (construing a federal statute to permit the use of eminent domain to acquire underground gas storage facilities because "[u]nderground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption"); *Ma-*

to include storage.[54] MGE argues that this means gas must be treated as in transit while stored and not subject to local taxation. The FERC regulation does not have this effect. FERC treats storage as part of transportation in order to ensure open access to storage by non-pipeline owners of natural gas who use the pipeline system. "Federal regulation of the natural gas industry is ... designed to curb pipelines' potential monopoly power over gas transportation."[55] In FERC Order No. 436,[56] FERC imposed common carrier status on natural gas pipeline companies, conditioning their receipt of a critical certification on their "acceptance of non-discrimination requirements guaranteeing equal access for all customers" to certain transportation services.[57] Order No. 436 did not address the problem of unequal access to gas storage facilities.[58] This was remedied in Order No. 636, which required pipelines to offer access to their storage capacity on an open-access basis.[59] "By defining transportation to include storage (citation omitted), the Commission made storage subject to the same non-discrimination requirements as capacity rights."[60] (internal quotation marks omitted) The court's decision on whether a state tax on storage gas contravenes the Commerce Clause has nothing to do with these federal regulatory concerns.

¶ 56 The dissent nevertheless continues to insist that FERC's inclusion of storage in the definition of transportation compels us to conclude that the taxation of stored natural gas is inconsistent with the Commerce Clause. To reiterate, this conclusion is not borne out by an examination of FERC Order 636. We will let FERC speak for itself:

"The Commission envisions a future gas market where buyers and sellers can meet to fashion deals according to their needs, with no decline in, and indeed with enhancement of, the quality and reliability of service for gas consumers.... *To that end, the Commission is amending part 284 [18 CFR 284] in several ways to upgrade pipeline services used to transport gas,* whether sold by a pipeline or another merchant. This will provide all gas purchasers with improved access to all gas sellers whether or not the gas purchasers want a "no-notice" firm transportation service. In brief, the Commission is making ten changes in part 284..... *Fifth, the Commission is amending § 284.1 to define transportation as including storage.*"[61] (emphasis added)

and:

"Because storage is now defined as transportation, under § 284.1(a), which must be

*ryland v. Louisiana,* 451 U.S. 725, 755, n. 27, 101 S.Ct. 2114, 2134, n. 27, 68 L.Ed.2d 576 (1981) (holding a tax to be invalid under the Commerce Clause because it was discriminatory, but stating in dictum that some of the gas might have had a substantial nexus with the state even though "[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey"); *Okla. Natural Gas Co. v. F.E.R.C.,* 28 F.3d 1281(D.C.Cir.1994) (holding that FERC had jurisdiction over a lateral gas pipeline connected to an interstate gas pipeline); *Calif. v. Lo-Vaca Gathering Co.,* 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965) (holding that the Federal Power Commission (predecessor to FERC) had jurisdiction of all sales of gas in interstate commerce).

**54.** The provisions of 18 C.F.R. § 284.2(a) state: "Transportation includes storage, exchange, backhaul, displacement, or other methods of transportation."

**55.** *United Distribution Cos. v. F.E.R.C.,* 88 F.3d 1105, 1122 (D.C.Cir.1996).

**56.** Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,

[Regs. Preambles 1982–85] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,665, order on reh'g, Order No. 436–A, [Regs. Preambles 1982–85] F.E.R.C. Stats. & Regs. (CCH)¶ 30,675 (1985), order on reh'g, Order No. 436–B, [Regs. Preambles 1986–90] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,688, order on reh'g, Order No. 436–C, 34 F.E.R.C. ¶ 61,404, order on reh'g, Order No. 436–D, 34 F.E.R.C. ¶ 61,405, order on reh'g, Order No. 436–E, 34 F.E.R.C. ¶ 61,403 (1986), *vacated and remanded sub nom. Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 1469, 99 L.Ed.2d 698 (1988).

**57.** *United Distribution, supra* note 55 at 1123.

**58.** *Id.* at 1133.

**59.** *Id.*

**60.** *Id.*

**61.** Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas

unbundled from sales, the pipeline itself may not retain, or hold, any storage capacity downstream of the place where it unbundles in connection with the providing of any of its own sales services. *Hence, the pipelines with downstream storage should have storage available to sell to transportation customers on an open access, nondiscriminatory, contract basis.* This will enable open access transportation customers to buy gas and store it for future use. *This will enable all shippers to more effectively manage their gas supply and procurement programs.*" [62]

¶ 57 Unlike the dissent, we can find nothing in the language or intent of Order 636 that compels us to reach the conclusion that state taxation of stored natural gas violates the Commerce Clause. That Order's inclusion of storage in the definition of transportation is simply part of an overhaul of FERC's regulations with the objective of restructuring the services provided by interstate natural gas pipelines "to ensure that transportation service is equal in quality for all gas supplies, whether the customer purchases the gas from the pipeline or from another supplier." [63]

¶ 58 The dissent cites Supreme Court jurisprudence which recognizes that gas storage facilities like that at North Hopeton are a critical part of the transportation of natural gas for its sale and resale in interstate commerce. We disagree that those cases support the invalidation of the ad valorem tax at issue here. In *Schneidewind v. ANR Pipeline Co.,* [64] a natural gas pipeline company and a natural gas storage company challenged a Michigan state statute that authorized the Michigan State Public Service Com-

mission to regulate the issuance of securities by the companies. Before holding that the state statute was preempted, the Court first pointed out that FERC had jurisdiction over the respondent gas storage company because it was a natural gas company under the Natural Gas Act of 1938. [65] The Court described storage as "a necessary and integral part of the operation of piping gas from the area of production to the area of consumption." [66] The Court's holding had nothing to do with the validity of ad valorem taxation under the Commerce Clause. The dissent also cites *Maryland v. Louisiana,* [67] which held a tax to be invalid under the Commerce Clause because it was discriminatory. [68] The Court did not invalidate the tax for lack of substantial nexus and even suggested in dictum that some of the gas at issue might have had a substantial nexus with the state even though it was in interstate commerce. [69]

### B. Second Prong—Fair Apportionment

▪▪▪▪▪ ¶ 59 The second prong of the *Brady* test requires that the tax be fairly apportioned to activities carried on by the taxpayer within the state. The trial court did not address this prong. MGE asserts that it is not met. The "central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction." [70] Whether a state tax affecting interstate commerce is fairly apportioned is determined by examining whether it is internally and externally consistent. [71] A tax is internally consistent if it is structured so that if every State were to impose an identical tax, no multiple taxation would result. [72] To be externally

Pipelines After Partial Wellhead Decontrol, (Docket Nos. RM91–11–000; RM87–34–065; Order No. 636), 57 FR 13267–02, 1992 WL 75263 (F.R.) (Thursday, April 16, 1992) (Issued April 8, 1992), 13,80–13,281.

62. *Id.* at 13,288–13,289.

63. *Id.* at 13,267.

64. *Supra* note 52.

65. *Id.* at 295, 108 S.Ct. 1145, 1148. The Natural Gas Act is codified at 15 U.S.C. § 717 *et seq.*

66. *Id.* at 295, n. 1, 108 S.Ct. 1145, 1148, n. 1.

67. *Supra* note 53.

68. *Id.* at 756, 101 S.Ct. 2114, 2134.

69. *Id.* at 756, n. 27, 101 S.Ct. 2114, 2134, n. 27.

70. *Goldberg v. Sweet*, 488 U.S. 252, 261, 109 S.Ct. 582, 588, 102 L.Ed.2d 607 (1989).

71. *Id.*

72. *Id.; Koch Fuels, Inc. v. State ex rel. Okla. Tax Comm'n*, 1993 OK 140, ¶ 29, 862 P.2d 471, 478.

consistent, the State must tax "only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." [73]

¶ 60 Decisions discussing the fair apportionment requirement generally involve taxed *activities* that have multi-state facets, rather than taxed *property*. An ad valorem tax is assessed only on property located within a single state. The record clearly shows that there was a certain volume of gas stored in Woods County on the assessment dates at issue. No other state could levy an ad valorem tax on gas located in Woods County. MGE contends that multiple states could assess taxes on the storage gas by using different assessment dates or allocation formulas. That argument is not persuasive. No states other than Kansas and Oklahoma have a Field Zone storage facility and Kansas has recently rejected the imposition of an ad valorem tax on storage gas based upon a state statute that exempts public utility companies from such taxation.[74] The Director of Ad Valorem Tax for Panhandle's parent corporation testified that the allocation methodology used by Panhandle to determine the amount and ownership of gas at the two Field Zone storage facilities forecloses multiple-state taxation. The tax is hence internally consistent. MGE disputes that it owns any of that gas, but that is a distinct issue from whether the county is taxing gas not present in the county.

¶ 61 A tax is externally consistent if it does not reach beyond that portion of the value of the transaction, enterprise, or property that is fairly attributable to economic activity within the taxing state. Woods County is seeking to tax gas located in Woods County

and nowhere else. The tax is hence externally consistent.

### C. Third Prong—Discrimination

¶ 62 The third prong of the *Brady* test looks at whether the tax discriminates against interstate commerce. The trial court concluded that the assessments in this case are discriminatory because they impute ownership of property to MGE "irrespective of contracts, tariffs, and federal regulations which restrict shippers from claiming ownership of [the gas]." MGE contends that the tax discriminates against interstate commerce because gas in storage is in interstate commerce and any storage was temporary. MGE claims the tax is being assessed simply because its gas is deposited into an interstate pipeline system.

¶ 63 In the Commerce Clause context, discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." [75] The Supreme Court has said, "Under our consistent course of decisions in recent years a state tax that favors in-state business over out-of-state business for no other reason than the location of its business is prohibited by the Commerce Clause." [76] A discriminatory tax is one that provides a direct commercial advantage to local business.[77] Oklahoma's ad valorem tax is a non-discriminatory property tax. It falls on anyone owning property located within the state on the assessment date for the support of government services that benefit all persons and property. Assessor testified that stored gas destined for sale within the state is similarly subject to the state's ad valorem tax. MGE made no showing that Woods County or any other county in Okla-

---

73. *Goldberg, supra* note 70 at 262, 109 S.Ct. at 589.

74. *In re Director of Property Valuation,* 284 Kan. 592, 161 P.3d 755 (2007) (holding that because natural gas companies do not "control and hold for resale" natural gas in an underground storage facility, they are not "public utilities" as defined by a state statute which excludes public utilities from a certain property tax exemption; since taxpayers did not meet the statutory definition of a public utility, their natural gas inventory was exempt from ad valorem taxation).

75. *Oregon Waste Syst., Inc. v. Dep't of Env'tl Quality of State of Oregon,* 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994).

76. *Am. Trucking Ass'ns, Inc. v. Scheiner, supra* note 39 at 286, 107 S.Ct. 2829.

77. *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959).

homa assesses the state's ad valorem tax in a manner that discriminates against out-of-state business. The tax in this case does not discriminate against interstate commerce.

### D. Fourth Prong—Reasonable Relationship to Services

¶ 64 The fourth prong of the *Brady* test is satisfied if the tax is reasonably related to the services provided by the state to the taxpayer. MGE points out that it has no offices or employees in Oklahoma and contends that it does not use the state's infrastructure. Since the risk of loss of the gas from a catastrophic event is on the pipeline, MGE claims it does not benefit from fire or police protection. Hence, MGE argues that the fourth prong of the *Brady* test is not satisfied by the tax at issue.

¶ 65 The state's ad valorem tax is a general revenue tax imposed for the support of local governments. It is not a user fee or assessment designed to reimburse the state for the use of a determinable quantity of government-owned or government-provided facilities and services. The Supreme Court has said that the use by foreign corporations of local opportunities "under the protection and encouragement of local government offers a basis for taxation as unrestricted as that for domestic corporations." [78] The Commerce Clause does not shield property and activities connected to interstate commerce from having to contribute to the *general cost* of providing governmental services even if those costs are not readily attributable to the taxed property or activity.[79] "The simple but controlling question is whether the state has given anything for which it can ask return." [80] The "relevant inquiry" is not "the amount of the tax of (sic) the value of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities," [81] but whether the tax is "reasonably related to the extent of the taxpayer's contact" with the taxing jurisdiction.[82] The tax in this case operates on the presence of personal property in Woods County. It is taxed to the same extent as all other personal property in the county. MGE is therefore being asked to shoulder no more than its fair share for the support of government-provided services and the receipt of "the advantages of a civilized society." [83]

¶ 66 To summarize, we find nothing in the record to support the trial court's conclusion that the *Brady* test is not met in this case other than the bare fact that the natural gas at issue is in some sense in interstate commerce. We therefore hold that the Woods County tax on the natural gas in storage at North Hopeton conforms to the Commerce Clause and is constitutionally valid.[84]

78. *Ford Motor Co. v. Beauchamp*, 308 U.S. 331, 334–335, 60 S.Ct. 273, 275, 84 L.Ed. 304 (1939).

79. *Commonwealth Edison Co., supra* note 43 at 623, 101 S.Ct. 2946.

80. *Wisconsin v. J.C. Penney Co.* 311 U.S. 435, 444, 61 S.Ct. 246, 246, 85 L.Ed. 267 (1940).

81. *Commonwealth Edison Co., supra* note 43 at 625, 101 S.Ct. 2946.

82. *Id.* at 626, 101 S.Ct. 2946.

83. *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 228, 100 S.Ct. 2109, 2123, 65 L.Ed.2d 66 (1980), *quoting Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 445, 99 S.Ct. 1813, 1820, 60 L.Ed.2d 336 (1979).

84. The Texas Court of Appeals has issued its opinion in *The Peoples Gas, Light, and Coke Co. v. Harrison Central Appraisal District*, 270 S.W.3d 208 (Tex.App.-Texarkana 2008). That decision, which has not yet been released for publication and is still subject to withdrawal or revision, concludes that the ad valorem taxation of natural gas in an underground storage facility located in Harrison County, Texas, violates the Commerce Clause. The dissent in a footnote makes favorable mention of this Texas decision, but we remain unpersuaded by that court's reasoning. The Texas court first scrutinizes Harrison County's ad valorem tax using the traditional continuity of transit analysis, a test that we reject today as having been superseded by the Supreme Court's decision in *Complete Auto Transit v. Brady*. Even if we were to apply the traditional test, we would not be persuaded that the Woods County tax violates the Commerce Clause based upon the Texas court's reasoning. The factors considered compelling by the Texas court—the identity of the pipeline company as the decision maker with respect to the place of storage and the FERC definition of transportation to include storage—are not determinative in our view. For a detailed explanation of our refusal to invalidate the tax here at issue based upon FERC's inclusion of storage in the regulatory definition of transportation, *see supra* text at pages 26, 27. In addition, we decline to follow the Texas court's

## VIII

## MGE'S GAS STORED AT NORTH HOPE-TON WAS NOT COVERED BY THE FREEPORT EXEMPTION

¶ 67 The provisions of Article 10, § 6A of the Oklahoma Constitution, known as the Freeport Exemption, state in pertinent part:

§ 6A. Tangible personal property moving through State—Situs.

A. All property consigned to a consignee in this State from outside this State to be forwarded to a point outside this State, which is entitled under the tariffs, rules, and regulations approved by the Interstate Commerce Commission to be forwarded at through rates from the point of origin to the point of destination, if not detained within this State for a period of more than ninety (90) days, shall be deemed to be property moving in interstate commerce, and no such property shall be subject to taxation in this State; provided, that goods, wares and merchandise, whether or not moving on through rates, shall be deemed to move in interstate commerce, and not subject to taxation in this State if not detained more than nine (9) months where such goods, wares and merchandise are so held for assembly, storage, manufacturing, processing or fabricating purposes; provided, further, that personal property consigned for sale within this State must be assessed as any other personal property. (emphasis added)

¶ 68 MGE argues that its natural gas in storage falls under the terms of the second clause of the Freeport Exemption, which exempts from taxation goods, wares and merchandise, whether or not moving on through rates, if such property is not detained more than nine months in this state for specified purposes, including storage. The trial court ruled that natural gas comes within the meaning of the phrase "goods, wares and merchandise," but construed the exemption to require that the property for which the exemption is sought originate outside of Oklahoma. The trial court found that all of MGE's natural gas originated within Oklahoma and hence ruled that the Freeport Exemption did not apply to MGE's storage gas. MGE supports the trial court's definitional decision, but argues that the out-of-state origin requirement, which expressly appears only in the first clause of the Freeport Exemption, should not be read into the second clause.[85]

reasoning in concluding that the ad valorem taxation of storage gas fails to meet the first and fourth prongs of the *Brady* test. The Texas appellate court concludes that the taxpayer in that case had no substantial nexus with Texas because it had no office or employees in that state and because the gas at issue was placed in storage by the pipeline company. The Texas court states, "We note again that, as required by the Commission [FERC] regulations, Pipeline—not Peoples [the taxpayer]—directs that activity [the act of storing gas], and we are to consider not whether Pipeline's activities have a substantial nexus with the State, but whether Peoples' activities do." We are convinced that the Texas court's focus on the parties' activities and their *in personam* types of contacts with the taxing state is mistaken. The tax at issue is an ad valorem property tax, a tax on property where it is located, not on the taxpayer's activities. In fact, the Texas court admits that gas stored under Harrison County, Texas, is owned by the taxpayer, but concludes that "the storage of natural gas at the North Lansing field is an insufficient nexus when we consider the particular, unique circumstances at hand and the complex relationships among the parties involved." The dissent in this case comes to a similar conclusion. While this case certainly presents some complexity, the fundamental question is simple: does the taxpayer own property located in the county seeking to impose the ad valorem tax? It is not whether the taxpayer is personally participating in activities in the state. Nothing in the Texas appellate court's decision persuades us that the answer to the correctly formulated question is anything other than a resounding yes. As for the fourth prong of the *Brady* test, which the Texas appellate court also finds unmet, suffice it to say that both the pipeline company and the owner of gas stored in an underground storage facility benefit from the state's services and protection.

85. Although MGE, the victorious party below, did not file a counter petition-in-error for review of the trial court's construction of the Freeport Exemption, it did raise the issue in its appellate brief. A successful party below who does not bring an appeal, counter-, or cross-appeal may, as appellee, press only those errors which, if rectified, would support the correctness of the trial court's judgment. *Bivins v. State ex rel. Okla. Mem. Hosp.*, 1996 OK 5, ¶ 20, 917 P.2d 456, 465. Such a party is restricted to the defense of the relief it was granted below. *Id; State ex rel. Macy v. Board of County Comm'rs of Okla. County*, 1999 OK 53, ¶ 19, n. 43, 986 P.2d 1130, 1140, n. 43. In making the argument that

¶ 69 Assessor invites the court to reverse the trial court's decision that natural gas falls within the meaning of the phrase "goods, wares and merchandise" and hold that the Freeport Exemption is unavailable to MGE for that reason as well as for the gas's in-state origin. Assuming, but not deciding, that the trial court correctly construed the phrase "goods, wares and merchandise" to include natural gas, we can and do dispose of the Freeport Exemption issue on the basis of the property's place of origin and will therefore leave the definitional question to another day.

¶ 70 Grammatically, the second clause of the Freeport Exemption is a proviso within a larger provision consisting of three clauses. While a proviso is usually presumed to restrain, qualify, limit, or define only the provision to which it is attached,[86] it may be considered tantamount to an independent enactment if the context requires it.[87]

¶ 71 The court has considered the relationship between the first and second clauses of the Freeport Exemption in several decisions. In *In re Assessment of 1969, Crescent Precision Products Inc.*,[88] the court was asked to decide whether the second clause of the Freeport Exemption incorporates the consignment requirement of the first clause ("All property consigned to a consignee in this State from outside this State to be forwarded to a point outside this State, ... )."[89] The court held that the consignment requirement does not extend to and limit the second clause.[90] In arriving at that conclusion, the court said,

> the trial court should have concluded that all or almost all of its storage gas is exempt from ad valorem taxation under the Freeport Exemption, MGE is merely asking the court to affirm a favorable *nisi prius* disposition *on an additional and alternative theory from that relied upon by the trial court*, not seeking to substitute a different form of relief in place of the relief granted. An appellate court will affirm a correct judgment on any applicable theory. *Bivins, supra* note 85 at ¶ 19, at 465. MGE is hence free to argue the applicability of the Freeport Exemption without having filed its own petition-in-error.

"It is apparent that § 6A consists of three grammatically complete and independent clauses, each with its own subject, which are mutually supportive of and complementary to each other and yet each expressing a complete thought with no ambiguities or absurdities.... Insofar as the facts of this case are concerned, clauses 1 and 2, except as being mutually supportive of and complementary to each other, are independent and coordinate, having different subjects, and each capable of standing alone. It thus cannot be said that the first clause modifies the second clause or that the limitations of the first clause are 'carried over' into the second one."[91]

¶ 72 The property in *Crescent* was purchased by the taxpayer outside of Oklahoma and shipped to its plant in Tulsa, so the question of the property's state of origin was not at issue.

¶ 73 A few years after this decision, the court was urged in *Austin, Nichols & Co., Inc. v. Oklahoma County Board of Tax–Roll Corrections*[92] to find exempt under § 6A manufactured goods shipped into Oklahoma from New York and stored for fewer than nine months at a warehouse in Oklahoma until sold to wholesalers in Oklahoma and surrounding states. The Assessor agreed that the goods sold to wholesalers in surrounding states were exempt under § 6A, but argued that the goods sold to wholesalers in this state were not. The manufacturer argued that the limitation to property destined to leave the state found in the first clause of the exemption should not be read into the second clause inasmuch as the two

86. *Hill v. Board of Ed.*, 1997 OK 111, ¶ 6, 944 P.2d 930, 932; *Russell v. State*, 1971 OK 117, ¶ 12, 488 P.2d 1264, 1267.

87. *Hudson v. Hopkins*, 1919 OK 183, ¶ 12, 183 P. 507, 510.

88. 1973 OK 106, 514 P.2d 933.

89. *See* ¶ 67 for the full text of the Freeport Exemption.

90. *Supra* note 88 at ¶ 13, at 935.

91. *Id.*

92. 1978 OK 65, 578 P.2d 1200.

are independent clauses and operate separately.

¶ 74 The court in *Austin, Nichols & Co.* agreed with the assessor that *§ 6A is applicable only to goods, wares and merchandise shipped to points outside the state* even though there is no language in clause 2 expressly stating that limitation.[93] While adhering to its earlier statement in *Crescent* that the three clauses of § 6A are independent and can stand alone, the court clarified that the provision as a whole has a singular purpose:

"The language relating to the separate treatment of the three paragraphs in Crescent … relates to specific language contained in one paragraph, 'consigned' or 'consignee', and not in the other, while in the case under consideration *the whole object of [§ 6A is] … to exempt property moving through Oklahoma from one State to another.*"[94] (emphasis added)

¶ 75 The court in *Austin, Nichols & Co.* relied for support on the ballot title passed by the Legislature at the time the Freeport Exemption was placed before the people for a vote. The ballot title states:

"Shall a Constitutional Amendment Amending Article X of the Constitution of the State of Oklahoma, by adding a new section thereto to be designated as Section 6A, providing that tangible personal property moving through Oklahoma from one State to another State shall not acquire situs within Oklahoma for purposes of taxation, be approved by the people?"[95]

A ballot title is a contemporaneous construction of a constitutional amendment and as such weighs heavily in determining an amendment's meaning.[96] The ballot title talks of property moving from one State to another through Oklahoma. The court interpreted this to mean that the property had to be destined to leave the State.

¶ 76 Our most recent pronouncement involving clause 2 of the Freeport Exemption is *Independent School District No. 9 of Tulsa County v. Glass.*[97] Although the decision did not require the court to construe the language of clause 2, the court's description of that clause assumes, but does not decide, that the out-of-state origination requirement of the first clause is not limited to that clause:

"Inventory of goods, wares and merchandise owned by a manufacturer and shipped to a manufacturer within the state *from outside the state* which are processed by the manufacturer within nine months are

**93.** *Id.* at ¶ 21, at 1204.

**94.** *Id.* at ¶ 14, at 1202–03.

**95.** *Id.* at ¶ 18, at 1203; Session Laws 1967, S.J.R. No. 44, § 2. The ballot title adopted by the Legislature was rejected by the Attorney General, who revised it in part by adding language containing the terms of the second clause of § 6A. The revised language, which is the language ultimately presented to the people on election day, stated:

"Shall a Constitutional Amendment amending Article X of the Constitution of the State of Oklahoma by adding a new section thereto, to be designated as Section 6A, providing that tangible personal property moving through Oklahoma from one state to another state shall not acquire situs within Oklahoma for purposes of taxation; and providing tangible personal property held for assembly, storage, manufacturing, processing, or fabricating purposes shall not be subject to taxation in Oklahoma if such property is not detained in the State more than nine (9) months, be approved by the people?"

*See* Oklahoma State Election Board, *Election Results and Statistics 1968,* at 39. The ballot title

as revised merely restates the language of the provision itself. It does not resolve the question of whether the out-of-state origin requirement of the first clause was intended to be incorporated in the second clause. Considering the difficulty the question presents to us today, it seems unlikely that the people voting on § 6A were even conscious of the ambiguity or thought one way or the other about the provision's meaning on this point. The Attorney General's view on the question may be more accurately reflected by Attorney General Opinion No. 65–215, which opined on the constitutionality of section 2 of Senate Bill 438. Section 2 of Senate bill 438 was almost identical to clause 2 of § 6A. The Attorney General assumed that the property described in section 2 of Senate Bill 438 was property shipped into Oklahoma, not property originating in Oklahoma. *See Austin, Nichols & Co., Inc., supra* note 92 for the pertinent language of Attorney General's Opinion No. 62–215.

**96.** *Wiseman v. Boren,* 1976 OK 2, ¶ 11, 545 P.2d 753, 758.

**97.** 1982 OK 2, 639 P.2d 1233.

constitutionally exempt from personal property taxation."[98] (emphasis added)

¶ 77 Having reviewed our prior decisions opining upon the singular purpose of the Freeport Exemption and considering the plain language of the provision, we hold that it was the intent of the drafters and the people to limit application of the second clause, like the first, to property originating outside of this state. As the court said in *Crescent*, "the whole object of [§ 6A is] ... to exempt property moving through Oklahoma from one State to another."[99] Property that originates at a location in Oklahoma, stops at another location in Oklahoma, and then moves to a destination outside of Oklahoma does not "move through Oklahoma from one State to another." Moreover, property that originates in Oklahoma cannot "not acquire situs in Oklahoma" because it begins with situs in Oklahoma.

¶ 78 MGE points out that under the Freeport Exemption's second clause, property is to be *deemed* to be moving in interstate commerce if it is not detained in Oklahoma for more than nine months. MGE contends that this portion of the provision eliminates the requirement of the first clause that the property must originate out of state. We disagree. The cited language simply means that an interruption for nine months or less shall not take the property out of interstate commerce, but it does not eliminate the requirement that the property originate outside of the state. In both *Crescent* and *Austin, Nichols & Co.*, the property at issue had been moving in interstate commerce when it entered Oklahoma from another state. The court said that being in interstate commerce was not enough to bring the property within the protection of the Freeport Exemption. The property also had to have an out-of-state location as its destination. Similarly, an out-of-state origination is required.

¶ 79 MGE argues that even if the Freeport Exemption applies only to property that originates outside of Oklahoma, the trial court was wrong in concluding that all of its gas originated within Oklahoma. MGE argues that if the assessment is to be based on a system-wide allocation rather than on where gas purchased by MGE could physically be located, then to be consistent the physical origination of the gas should be ignored for Freeport Exemption purposes as well and all of its gas should be deemed to originate at the Kansas location where MGE "contractually" nominates gas into and out of storage.

¶ 80 We disagree. The contested assessment was made on a theory of common ownership of the natural gas at North Hopeton on the assessment dates. All of that gas originated in Oklahoma. Gas originating outside of Oklahoma was not apportioned to MGE. The location from which MGE nominates gas into and out of storage is immaterial. The critical question is where in the real, physical world the gas stored at North Hopeton originates and that place is Oklahoma. That is what the trial court found and the record contains ample competent evidence supporting that decision. It is not inconsistent to allocate to MGE for purposes of ad valorem taxation gas at North Hopeton which it owns in common with all other shippers using the Panhandle pipeline, while at the same time recognizing that all of the gas of all of the shippers stored at North Hopeton originates in Oklahoma.

## IX

## SUMMARY

¶ 81 Natural gas is tangible personal property. It has a location and it has an owner. Because of the physical properties of natural gas, the particular molecules purchased by a shipper and placed into a pipeline cannot be traced. That does not and cannot mean the gas has no discernable location or owner. Like other tangible personal property, it has both. We hold that the contested tax was an assessment on tangible personal, not intangible exempt property, that gas stored at North Hopeton is located for ad valorem tax purposes in Woods County, and that as a commingled, fungible commodity, stored natural gas is owned in common by all shippers

---

98.  *Id.* at ¶ 15, at 1239.

99.  *Crescent, supra note* 88 at ¶ 14, at 1202–03.

maintaining a positive storage account balance based on a proportional allocation of volumes. We also hold today that the trial court erred in ruling that the assessed volumes of gas held in storage at North Hopeton are protected from state ad valorem taxation by the Commerce Clause of the United States Constitution. Finally, we decline to afford relief to MGE under the Freeport Exemption inasmuch as we concur in the trial court's conclusion that this exemption is not applicable to MGE's storage gas.

¶ 82 **THE TRIAL COURT'S JUDGMENT IS REVERSED.**

¶ 83 WINCHESTER, C.J., EDMONDSON, V.C.J., and HARGRAVE, OPALA, TAYLOR and REIF, JJ., concur.

¶ 84 KAUGER and COLBERT, JJ., concur in result.

¶ 85 WATT, J., dissents.

WATT, J. dissenting:

¶ 1 The majority gives a perfunctory nod to a federal regulation promulgated by the Federal Energy Regulatory Commission (FERC) specifically providing that the transportation of natural gas "includes storage."[1] Nevertheless, it ignores the extent to which the same federal regulatory scheme controls

the decision of whether the natural gas here is in the stream of interstate commerce. It reasons that the stored gas "is not in transit in such a way as to invoke the Commerce Clause." The majority also determines that Missouri Gas Energy (MGE), a company which the majority acknowledges sells no gas in Oklahoma and maintains no facilities or employees in this state, has a sufficient nexus with the state to support taxation of natural gas temporarily resting within our borders whether or not the natural gas is considered to be in the stream of interstate commerce.[2] I can agree with neither of these conclusions.[3] Therefore, I dissent.[4]

¶ 2 **FEDERAL LAW MAKES IT CLEAR THAT NATURAL GAS INTENDED FOR INTERSTATE TRANSPORT IS IN THE STREAM OF INTERSTATE COMMERCE WHEN IT IS TEMPORARILY PLACED IN STORAGE.**

¶ 3 The majority's argument that federal regulations have little or no credence in determining whether the natural gas stored in an Oklahoma facility is in the stream of commerce is unconvincing. It comports with neither the clear language of the regulation nor with federal precedent.

¶ 4 Administrative rules are valid expressions of lawmaking powers having the force and effect of law.[5] Administrative rules, like

---

1. Title 18 C.F.R. § 284.1 providing:

   "Transportation includes storage, exchange, backhaul, displacement, or other methods of transportation."

2. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), rehearing denied, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977) provides that not all goods in interstate commerce are free from state taxation. Taxation is allowed if the tax: 1) is applied to an activity with a substantial nexus with the taxing state; 2) is fairly apportioned; 3) does not discriminate against interstate commerce; and 4) is fairly related to services provided by the state.

3. Nothing in the majority's analysis would keep the same gas owned by the same company from being subject to *ad valorem* tax in more than one storage facility. If natural gas stored in Oklahoma has a sufficient nexus to support the tax, the same gas stored in a Texas facility might well be subject to the same burden. The facts presented here are substantially different than those addressed by the Court in *Cities Serv. Gas Co. v.*

*Oklahoma Tax Comm'n*, 1989 OK 69, 774 P.2d 468, *cert. denied*, 493 U.S. 854, 110 S.Ct. 157, 107 L.Ed.2d 115 (1989) in which this Court held that a conservation excise tax would not place an unconstitutional burden on interstate commerce. In *Cities Service*, this note supra, Oklahoma was the only state which could tax the severance as it was the state from which the natural resource was actually severed.

4. The majority discounts the analysis of a Texas Court of Appeals case presenting facts virtually identical to those we deal with here. The Texas Court determined that levying an *ad valorem* tax on natural gas stored in its state impermissibly infringed on the commerce clause. It did so primarily upon the grounds that the gas remains in interstate commerce while in natural gas storage facilities and that the entity owning the gas lacked a sufficient nexus with the storage state to support imposition of the tax. See, *The Peoples Gas, Light, and Coke Co. v. Harrison Central Appraisal Dist.*, 270 S.W.2d 208 (Tex.App.2008).

5. *McClure v. ConocoPhillips Co.*, 2006 OK 42, ¶ 17, 142 P.3d 390.

statutes, are given a sensible construction bearing in mind the evils intended to be avoided.[6] If an administrative rule is clear and unambiguous, there is no need to resort to rules of construction to ascertain its meaning.[7]

¶ 5 Application of constructive tools is unnecessary to determine whether the federal regulatory agency would treat the natural gas here as being in the stream of commerce. The federal regulation specifically states, in clear and unambiguous language, that transportation "includes storage."[8] Furthermore, it is unquestioned that the federal regulations control transportation of natural gas in interstate commerce.[9] **The United States Supreme Court has made it clear that gas storage facilities like the one at issue here are a critical part of the transportation of natural gas for its sale and resale in interstate commerce.[10] The High Court has also recognized that "gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[11]**

¶ 6 The natural gas MGE purchases and places in the pipeline system is stored in the Oklahoma storage facility but it is never intended for consumption in this state. It is placed with the interstate common carrier, Panhandle Eastern Pipeline Company (Panhandle), for transportation to the state of Missouri. There is no question under the federal regulation that, while in storage in Oklahoma, the gas remains in transportation and that it is intended to be sold in interstate commerce.

### ¶ 7 MGE HAS NO SUBSTANTIAL NEXUS WITH OKLAHOMA TO SUPPORT THE TAXATION OF NATURAL GAS IN INTERSTATE COMMERCE UNDER THE TEACHINGS OF *COMPLETE AUTO TRANSIT v. BRADY.*

¶ 8 In *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), *rehearing denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977), the United States Supreme Court fashioned a four-part test to govern the imposition of state taxes on goods in the stream of interstate commerce.[12] A tax may be sustained under *Brady* against a commerce clause challenge if the tax: 1) is applied to activity with a substantial nexus with the taxing state; 2) is fairly apportioned; 3) does not discriminate against interstate commerce; and 4) is fairly related to services provided by the state.

¶ 9 The trial court concluded its analysis with application of the first condition of the test. It determined that there was no such nexus where MGE's natural gas was at all times while in storage in the possession and control of the common carrier, Panhandle, and where the gas was committed to being transported out of state for sale and consumption. Although the majority recognizes that "[t]he nexus requirement ensures that, with respect to goods in interstate commerce, a state will not be able to exact a fee simply for the privilege of passing through a state," it determines that the storage of natural gas for a substantial portion of the year is sufficient to create the nexus requirement under *Brady.*

¶ 10 The fallacy with the majority's logic is that it looks strictly at the generic act of

---

6. *Walker v. Group Health Serv., Inc.,* 2001 OK 2, ¶ 27, 37 P.3d 749; *Oklahoma Alcoholic Beverage Control Bd. v. Burris,* 1980 OK 58, ¶ 13, 626 P.2d 1316, 20 A.L.R.4th 593.

7. *Coppola v. Fulton,* 1991 OK 18, ¶ 12, 809 P.2d 1291; *Mayfield v. H.B. Oil & Gas,* 1987 OK 106, ¶ 9, 745 P.2d 732.

8. Title 18 C.F.R. § 284.1, see note 1, supra.

9. *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in*

*The Cloverly Geological Formation,* 524 F.3d 1090 (9th Cir.2008).

10. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 308, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

11. *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576 (1981); *California v. Lo–Vaca Gathering Co.,* 379 U.S. 366, 369, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965).

12. *Cities Serv. Gas Co. v. Oklahoma Tax Comm'n,* see note 3, supra.

storing gas in an Oklahoma facility. An activity which the federal law provides is not static but an integral part of the transportation process.[13] Furthermore, although it is unquestioned that some portion of the gas in the storage facility belongs to MGE, it is the common carrier, Panhandle, who directs the storage activity and who ultimately releases the gas into interstate commerce. MGE has no offices in Oklahoma. It owns no property here. It has no employees within the boundaries of our state. MGE's only connection to Oklahoma is its utilization of Panhandle's pipeline system which contains a storage facility. MGE's connection to Oklahoma is too tenuous to subject its natural gas to *ad valorem* taxation in Oklahoma.

13. Title 18 C.F.R. § 284.1, see note 1, supra.

14. Title 18 C.F.R. § 284.1, see note 1, supra; *Schneidewind v. ANR Pipeline Co.*, see note 10, supra. See also, *Williston Basin Interstate Pipe-*

## CONCLUSION

¶ 11 FERC regulations and the Supreme Court's pronouncements on the same require that we consider the gas MGE stores in Oklahoma to be in the transportation system.[14] There is no question that the transportation itself will be interstate. Because there is no substantial nexus between MGE and its activities within Oklahoma, the gas may not be taxed under the commerce clause. The majority holds otherwise. I dissent.

*line Co. v. An Exclusive Gas Storage Leasehold & Easement in The Cloverly Geological Formation,* note 9, supra.